# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:08-CR-129 |
| | ) | (PHILLIPS/GUYTON) |
| ADAM HOLMES, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court, as may be appropriate.  The Defendant is charged in a three count Indictment [Doc. 1], with (1) being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1); (2) possession with intent to distribute crack cocaine within 1,000 feet of the real property of a public elementary school in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 860; and (3) knowingly using and carrying a firearm during and in relation to a drug trafficking crime in violation of 21 U.S.C. § 841(a)(1).

The Defendant has filed a Motion to Suppress [Doc. 12], which the Government opposes [Doc. 15].  The parties appeared before the Court for a motion hearing on November 25, 2008, to address the Defendant's motion.  Assistant United States Attorney David Lewen ("AUSA Lewen") was present representing the Government.  Attorney Kim Tollison ("Attorney Tollison") was present representing the Defendant, who was also present.  The Court heard the evidence presented and the arguments of the parties on the motion.  The Court took the motion under advisement on November

26, 2008.

## I. FACTS

At the hearing there was a single witness, Officer John Pickens ("Officer Pickens") of the Knoxville Police Department (KPD). Officer Pickens explained that he has been a KPD officer for two years. Officer Pickens is assigned to the east sector of Knoxville, and he stated that he was "extremely familiar" with the city's eastern district, the area where the events in this case took place.

Officer Pickens testified that he was on duty on August 2, 2008, the night on which the Defendant is alleged to have committed the above described crimes. Officer Pickens stated that he was conducting surveillance of the Brothers night club on Martin Luther King Boulevard. Officer Pickens explained that he was stationed on top of the Atlas Electric Supply Company across the street from the club, which was a known high crime area. Officer Pickens estimated that between 1:30 and 2:00 a.m. that morning, he heard the sound of gunshots coming from the intersection of Martin Luther King Boulevard and Chestnut Street. Officer Pickens stated that, when he looked in the vicinity that the gunshots were coming from, he saw a white box-shaped Chevrolet Caprice with large rims on it. The Government presented Officer Pickens with a photograph of an automobile, which Officer Pickens identified as a picture of the white box-shaped Chevrolet Caprice he had seen at the intersection of Martin Luther King Boulevard and Chestnut Street. The photograph was received into evidence as **Exhibit One** without objection.

Officer Pickens testified that when he saw the Caprice its engine was engaged and it was facing northbound on Chestnut Street. Officer Pickens confirmed that if the Caprice proceeded in the direction that it was facing, it would have gone to the 2400 block of Martin Luther King Boulevard. Officer Pickens stated that he could see the Caprice had a black male driver and that he

2

later determined that the car was registered to the Defendant. Officer Pickens explained that he did not continue observing the car but, instead, began scanning the crowd to make sure that there were no victims of the gunshots lying on the ground.

Officer Pickens confirmed that he saw the same Chevrolet Caprice later that morning at the Weigel's, a market and gas station, located at 411 E. Summit Hill Avenue. Officer Pickens stated that around 4:00 a.m. radio transmissions advised officers to look for a white box-shaped Chevrolet Caprice, with large chrome rims, being driven by a black male, because the Caprice was observed in a disturbance call in the 2400 block of Martin Luther King Boulevard. According to the "Be on the Lookout" (BOLO) advisory, there had been a verbal fight and/or argument, over gang-related incidents, and it was alleged that a firearm was involved. Officer Pickens explained that upon hearing the BOLO advisory, he thought that the vehicle was the same one he had seen earlier in the night. Officer Pickens noted that eyewitnesses at the scene said the Caprice was heading toward Weigel's on Summit Hill Ave, which was three to five minutes from the Martin Luther King-Chestnut intersection.

Officer Pickens explained that when he heard the BOLO he was at the KPD headquarters at 800 Howard Baker Jr. Boulevard, which is approximately three minutes from the Weigel's. Upon hearing the BOLO, Officer Pickens drove to the Weigel's. Officer Pickens stated that he is familiar with this particular Weigel's as a high-crime area with prostitution and drug activity and violent crime. Officer Pickens estimated that in the last two years he has responded to incidents at the location approximately two to three times per week.

Officer Pickens testified that prior to pulling into the Weigel's he saw the box-style Chevrolet Caprice with large rims, which he was a hundred percent positive was the same car he had

seen earlier. Officer Perkins explained that, despite it being approximately 4:00 a.m. and dark out, he could see the Caprice because it was parked directly underneath a street light. The Government presented Officer Pickens with a photograph, which he identified as a photograph of the east side of the Weigel's, with the Caprice in the position it was in when he arrived—parked directly underneath a street light. The photograph was received into evidence as **Exhibit Two** without objection.

Officer Pickens explained that as he pulled into the Weigel's he could see a black male sitting on the trunk of the Caprice. Officer Pickens stated that at the time he pulled into the Weigel's people were screaming "Five-O," a warning that police are arriving. Officer Pickens said that in response to this warning, people began scattering and the Defendant, the black male seated on the trunk of the Caprice, looked in his direction, made eye-contact with Officer Pickens, and hopped off the trunk. Officer Pickens observed the Defendant proceed around the front of a Buick LeSabre, which was parked next to the Caprice, and walk back toward the Buick's rear passenger door.

Officer Pickens explained that another, larger black male was at the rear passenger door and the Defendant appeared to try to hide the front of his body behind the other male. Officer Pickens confirmed that he had received training in weapons concealment and knew to look for body language, nervous actions, and certain movements as indicators of a suspect being armed. Further, Officer Pickens stated that he knew firearms were most often hidden in a suspect's waistband and the small of the back. At the hearing, Officer Pickens demonstrated the motions he observed the Defendant make. He explained that based upon his training and experience the Defendant was attempting to conceal a firearm. He stated that he could see what "appeared to be the butt end of a pistol in his waistband." [Tr. 15].

Officer Pickens explained that upon seeing the Defendant make the movements described above, he ordered the Defendant out of the vehicle and drew his firearm. Officer Pickens felt sure that the Defendant heard the command to get out of the vehicle because of the loud tone in which it was delivered, but the Defendant did not obey the initial commands. Officer Pickens explained that because the Defendant did not exit the vehicle, he and his partner approached the vehicle, and his partner, Bryan Schreiber ("Officer Schreiber"), removed the Defendant from the vehicle. Officer Pickens stated that there was also a front seat passenger and a driver in the vehicle. Officer Pickens affirmed that he did not break visual contact with the Buick or its occupants until the vehicle was secured. Officer Pickens stated that after the Defendant was detained his partner ran a records and warrants check, which revealed that the Defendant was a convicted felon. Officer Pickens explained that only a few minutes elapsed from the time the Defendant was removed from the vehicle until the records were returned and the officers realized that the Defendant was a convicted felon.

Officer Pickens confirmed that the other occupants of the Buick were removed from the vehicle, and the owner of the vehicle was asked for permission to search the vehicle, which was given. Officer Pickens stated that upon search of the vehicle officers found a loaded nine millimeter handgun in the backseat of the vehicle. Officer Pickens confirmed that the Defendant was the only person who was sitting in the backseat of the vehicle. The Government then presented Officer Pickens with a photograph of the backseat of the car. Officer Pickens stated that the photograph was of the firearm as it was found laying in the floorboard of the vehicle. Officer Pickens noted that the towel which was in the seat above where the firearm was laying was the same towel that the Defendant was sitting on when Officer Pickens approached the automobile. The photograph was received into evidence as **Exhibit Three** without objection.

The Government then presented Officer Pickens with another photograph, which he testified was a photograph of the gun that was found in the back floorboard of the Buick. Officer Pickens confirmed that the color of the pistol grip was black, which was the same color of the item he saw in the Defendant's waistband. The photograph was received into evidence as **Exhibit Four** without objection.

Finally, Officer Pickens stated that the Defendant was arrested for being a convicted felon in possession of a firearm. He further stated that during a search incident to the arrest, officers located crack cocaine in the Defendant's right front pocket.

On cross-examination, Officer Pickens explained that he was conducting surveillance of Brothers Club from approximately 10:00 or 10:30 p.m. until 3:45 or 3:50 a.m. Officer Pickens again stated that he heard gunshots around 1:30 or 2:00 a.m. but acknowledged that he did not see anyone shoot from the white box-styled, Chevrolet Caprice. Officer Pickens said he called in the incident on the special events channel which the surveillance team was using. Officer Pickens said he called in that several shots had been fired but said he did not mention the automobile description, the black male driver, or that he could identify the automobile.

Officer Pickens confirmed that at approximately 3:45 a.m. he left the surveillance scene and went to the police station, where he got the radio transmission about the altercation on Martin Luther King Boulevard. Officer Pickens again stated that the call that was broadcast described a verbal fight and argument that included gang-related items. Officer Pickens explained that the transcripts of the radio calls did not mention gang-relations because the gang-relations were mentioned in person-to-person calls made by officers. Officer Pickens explained that the description given was of a black male driving a white box-style Chevrolet Caprice with large rims, but it did not say the

6

number of passengers in the automobile. Attorney Tollison noted that the transcript of the police call said four black males were in the suspect vehicle; Officer Pickens confirmed that whatever the transcript said was correct.

Officer Pickens acknowledged that the incident occurred at the 2400 block of Martin Luther King Boulevard and that an automobile leaving that scene would not, necessarily, be heading toward the Weigel's. However, Officer Pickens noted that Weigel's is the only place open at that time of the night and is a popular hangout after people leave clubs. Officer Pickens explained that he pulled into the east side of the Weigel's parking lot off of Patton Street. Officer Pickens stated that his video camera was running at the time he pulled up to the Weigel's and he confirmed that several vehicles were sitting in the east side of the parking lot.

Officer Pickens estimated that between half a dozen and a dozen people were around the Defendant when he pulled into the lot. Officer Pickens confirmed that the Caprice was backed into a spot and he pulled in front of the vehicle. Officer Pickens said that people began to scatter after the "Five-O" warning was screamed. Officer Pickens agreed that there were numerous people and automobiles in the lot at the time he pulled up and that the Defendant was not the only person moving. Officer Pickens said that he saw the black pistol when the Defendant rounded the front of the Buick and was facing him. Officer Pickens noted that he was standing at the driver's side front quarter of his vehicle about twenty five or thirty feet from the Defendant. Officer Pickens agreed that rounding the front of the Buick, the light would have been at the Defendant's back, but Officer Pickens said he could tell the item was a black handgun.

7

Officer Pickens confirmed that the Defendant then slid into the backseat of the Buick and shut the door. Officer Pickens explained that while this was going on the other people in the area got into other automobiles, and the majority of them left the Weigel's immediately. Officer Pickens stated that as he approached the Buick he did not initially draw his gun, but after processing what he had seen, he drew his gun. Officer Pickens said he did not have the gun pointed at the Defendant, but he had the gun in a low, ready position. Officer Pickens said that the first time he ordered the Defendant out of the automobile he was five feet from his automobile, and the Defendant did not respond. Officer Pickens said that as he approached the automobile, he could see the Defendant inside the automobile looking over his shoulders and asking why he should exit the vehicle. Officer Pickens said that when he was approximately three feet from the automobile, his back-up, Officer Schreiber, arrived and got the Defendant out of the automobile and put him in a marked police cruiser.

Officer Pickens explained that the owner, who was also the driver, of the Buick got out of the vehicle when she was ordered out after the Defendant was detained. She gave consent to search the vehicle, and Officer Pickens said he then searched the Buick and saw the gun. Officer Pickens said he did not remove the gun, but after the gun was located, the Defendant's detention continued because possession of a firearm is a misdemeanor charge. Officer Pickens said the Defendant was placed under arrest after the records check was returned revealing that the Defendant was a convicted felon. Officer Pickens confirmed that the crime lab removed and processed the gun. Officer Pickens stated that Officer Schreiber actually placed the Defendant under arrest because Officer Pickens was doing paperwork at that time. Officer Pickens said that an initial patdown of the Defendant was conducted when the Defendant was detained, and once the Defendant was

8

arrested, the wagon driver searched the Defendant and emptied his pockets, revealing crack cocaine.

On redirect, Officer Pickens confirmed that when he arrived at the Weigel's there were no other vehicles in the parking lot which matched the description of a white older model, box-style Chevrolet Caprice with large chrome rims. Officer Pickens again testified that **Exhibit Two** was the vehicle that he saw at the Weigel's on the night in question and that the Defendant was seated on that vehicle.

## II. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. The Defendant contends that he was illegally seized and unlawfully detained because there was not sufficient reasonable suspicion to support a detention under Terry v. Ohio, 392 U.S. 1 (1968). Further, the Defendant claims that even if there was reasonable suspicion for the stop, the detention exceeded the reasonably necessary level of intrusion under Terry and became an unlawful detention. The Defendant also disputes the probable cause supporting his arrest, and based upon his allegation that there was no probable cause for arrest, the Defendant argues that the evidence found on his person after his detention was the fruit of an unlawful search. Based upon the above theories, the Defendant moves to suppress the handgun and crack cocaine found during the detention and search. The Court will consider each of the Defendant's contentions in turn, and finally, the Court will address the Defendant's standing to object to the search of the Buick.

### A. Investigative Stop and Detention

The Defendant first argues that he was illegally seized and unlawfully detained because there was not sufficient reasonable suspicion to support an investigative stop under Terry v. Ohio. Alternatively, the Defendant argues that even if there was reasonable suspicion for the stop, the

detention exceeded the reasonably necessary level of intrusion and became an unlawful detention. The Government responds that Officer Pickens had first-hand observations and an eyewitness statement supporting suspicion of the Caprice. The Government argues that the observations and statement coupled with the Defendant's evasive behavior gave Officer Pickens reasonable suspicion that criminal activity was afoot. The Government maintains that the stop did not exceed the reasonably necessary level of intrusion and was not an unlawful detention.

The Fourth Amendment prohibits searches and seizures by the government that are unreasonable, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. Terry v. Ohio, 392 U.S. 1, 9 (1968); United States v. Cortez, 449 U.S. 411, 417 (1981). Because the "balance between the public interest and the individual's right to personal security," tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity "may be afoot." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975); United States v. Sokolow, 490 U.S. 1, 7 (1989); United States v. Cotton, 928 F.2d 405 (6th Cir. 1991).

The determination of reasonable suspicion is to be made "in light of the totality of the circumstances," United States v. Caruthers, 458 F.3d 459, 465 (6th Cir. 2006), and requires the officers to " have a particularized and objective basis for suspecting the particular person stopped of criminal activity," United States v. Hurst, 228 F.3d 751, 757 (6th Cir. 2000). Although "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard," an officer's reliance on a mere "hunch" is insufficient to justify a stop. United States v. Arvizu, 534 U.S. 266, 274 (2002)

10

(citing Terry, 392 U.S. at 27 and Sokolow, 490 U.S. at 7).

The Court of Appeals for the Sixth Circuit recommends a two-part test to determine the legitimacy of an investigatory stop. See e.g., United States v. Luqman, 522 F.3d 613, 616-17 (6th Cir. 2008); United States v. Davis, 430 F.3d 345 (6th Cir. 2005). First, a court must determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." Davis, 430 F.3d at 354 (quoting United States v. Garza, 10 F.3d 1241, 1245 (6th Cir.1993)). If the basis for the Terry stop was proper, then the Court must determine "whether the degree of intrusion ... was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." Davis, 430 F.3d at 354 (quoting Garza, 10 F.3d at 1245).

The "totality of the circumstances" in the present case consists of the following pieces of information: Officer Pickens's observation of an automobile fitting the unique description of a white box-style Chevrolet Caprice with large rims at the scene of gunfire; a known witness's statement that a suspect was leaving the scene of a shooting in a car fitting the same unique description and was headed toward the Weigel's; Officer Pickens's knowledge that the scene of the shooting was just moments from the Weigel's; the Defendant sitting on the hood of the automobile fitting the unique description only moments after the shooting; the lateness of the hour; the high-crime volume at the Weigel's; the Defendant's evasive behavior; the Defendant's movements and posture, which were consistent with carrying a weapon; and finally, Officer Pickens's observation of what appeared to be the butt of a firearm in the Defendant's waistband.

Looking first at the unique description of the automobile and its proximity to the scene of

11

two different criminal acts on the night in question, the Court concludes that this information weighs in favor of reasonable suspicion. The Court of Appeals for the Sixth Circuit has previously held that such information constitutes specific and articulable facts which give rise to reasonable suspicion. For example, in United States v. Hurst, 228 F.3d 751(6th Cir. 2000), a "car roughly matching the appearance of a suspects in color and style" was reportedly seen outside a residence at the time of a burglary. Id. at 757. Minutes later, an off-duty officer observed a vehicle matching the previously reported description traveling away from the vicinity of the residence at a high speed and reported to other deputies that the automobile's front grill was missing. Id. Another deputy spotted and pulled over a vehicle traveling in the reported direction with the distinctive description, and at a time consistent with the time needed to travel to that point from the residence. Id. The Court of Appeals held that based upon the final deputy's knowledge of the time and area coupled with the other reported information, including the description and direction of travel, the deputy had reasonable suspicion to stop the vehicle. Id.

In the present case, the description of the automobile was equally unique—a white automobile which is over twenty years old with large rims— and, as in Hurst, supports reasonable suspicion of the vehicle. A known eye-witness had informed officers that an automobile fitting the description was linked to an earlier altercation involving gunfire and was headed to the Weigel's. Further, the vehicle's presence upon Officer Pickens's arrival was consistent with the short amount of time required to travel between the crime scene and the Weigel's. Finally, Officer Pickens's earlier observation of the automobile, even if not conclusive proof of criminal activity, gives additional circumstantial support for reasonable suspicion of the Defendant. See United States v. Blum, 614 F.2d 537 (6th 1980) (finding reasonable suspicion supporting an investigative stop where

12

officers initially spotted a truck near a train yard where burglaries had been reported and later the same night spotted the same truck again parked near the train yard).

While the above factors and circumstances support reasonable suspicion of the automobile, the Court continues its analysis for reasonable suspicion tied directly to the Defendant out of an abundance of caution. First and foremost is the Defendant's location at the time of Officer Pickens's arrival—on the hood of the suspect vehicle. In addition, the high-crime rate at the Weigel's, the late hour, observation of an object that appeared to be a handgun, and the Defendant's nervous and evasive behavior support Officer Pickens's suspicions of the Defendant.

While an individual's presence in an area of frequent criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime, Brown v. Texas, 443 U.S. 47, 52 (1979), "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation," United States v. Wardlow, 528 U.S. 119, 124 (2000). In the present case, Officer Pickens testified that he had worked the eastern police district in Knoxville and was familiar with the Weigel's, which in his recollection was involved in two to three criminal incidents per week. Although this factor cannot stand alone, the high-crime level at the Weigel's supported Officer Pickens's suspicion of the Defendant.

The late hour of the stop also contributes to reasonable suspicion. The Court of Appeals for the Sixth Circuit has previously cited 1:00 a.m. and 1:30 a.m. as times that are sufficiently late to arouse suspicion. United States v. Blair, 524 F.3d 740, 751 (6th Cir. 2008). In the present case, the Defendant was observed on the suspect vehicle at approximately 4:00 a.m. Again this information supports a finding of reasonable suspicion but does not stand alone.

Nervous, evasive behavior is also pertinent to determining reasonable suspicion, Brignoni-Ponce, 422 U.S. at 885, but "nervousness is generally included as one of several grounds for finding reasonable suspicion and not a ground sufficient in and of itself." United States v. Mesa, 62 F.3d 159, 162 (6th. Cir. 1995). In the present case, the Defendant's nervousness was combined with a posture and mannerisms consistent with carrying a concealed weapon, which is more suspicious than mere nervous fidgeting. The Defendant correctly points out that other persons in the area scattered when Officer Pickens's cruiser pulled into the parking lot, but the Defendant's actions are distinguished from those of other bystanders by his eye-contact with the officer followed by immediate diversion of his eyes, his posture and mannerisms which indicated that he was carrying a firearm, and his use of another larger man to conceal him from the officer's sight while he entered another vehicle. The Defendant's nervous and evasive behavior is distinguishable from the behavior of others in the crowd and contributes to reasonable suspicion for stopping the Defendant.

Finally, and most importantly, Officer Pickens saw what appeared to him to be the butt of a firearm in the Defendant's waistband just before the Defendant entered the Buick. It is well-established that in "evaluating whether the totality of the circumstances supports the conclusion that reasonable suspicion exists, courts must allow officers to draw upon their experience and training to make inferences." United States v. Torres-Ramos, 536 F.3d 542, 552 (6th Cir. 2008) (citing Arvizu, 534 U.S. at 273). Officer Pickens has received training in weapon concealment and in his two years with the police department certainly became familiar with handguns. Drawing on his experience and training, he believed the object he saw protruding from the Defendant's waistband was a handgun.

The Defendant argues that Officer Pickens was not able to see the handgun, given the time

14

of night and his perspective. The Court, however, finds Officer Pickens's testimony to be credible and notes that these events took place directly under a street lamp which illuminated the area. Accordingly, the Court finds that Officer Pickens's observation of an object that appeared to be a handgun in the Defendant's waistband also supported the investigative stop.

Officer Pickens's previous observation of the automobile, with the other reported events and eyewitness statements, the late-hour, the high-crime rate of the Weigel's, his observation of what appeared to be a handgun, the Defendant's nervous behavior, and the Defendant's posture and mannerisms, combine to provide reasonable suspicion to stop the Defendant. Officer Pickens testified that he was aware of all of the above listed pieces of information. These pieces of information are specific and articulable facts which gave rise to reasonable suspicion that criminal activity was afoot, and therefore, the totality of the circumstances supports a finding that the stop was reasonable and lawful under the first prong of Terry.

After concluding that the basis for the stop was proper, the Court now turns to the second prong of Terry and must determine "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." Garza, 10 F.3d at 1245 (internal quotation marks and citation omitted). The Court must ascertain whether the detention is reasonable, that is, (1) sufficiently limited in time and (2) employing investigative means that are the least intrusive means reasonably available. Bennett v. City of Eastpointe, 410 F.3d 810, 825-26 (6th Cir. 2005). "In assessing whether a detention is too long in duration to be justified as an investigative stop, . . . it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it

was necessary to detain the defendant."  United States v. Sharpe, 470 U.S. 675, 687 (1985).

However, the abstract prospect that the stop may have been accomplished by a less intrusive means

does not, itself, render the search unreasonable.  See Id.

As examined above, Officer Pickens had reasonable suspicion that criminal activity was

afoot.  Based on his earlier observations of the suspect automobile, the reports of the gunfire

moments before his arrival at the Weigel's, his observation of what appeared to be a handgun, and

the Defendant's mannerisms, Officer Pickens had a reasonable suspicion that the Defendant was

specifically committing the crime of unlawful possession of a weapon, a violation of Tennessee

Code Annotated § 39-17-1307.  After the Defendant did not comply with Officer Pickens's

commands to exit the automobile, Officer Pickens recognized that he was dealing with a suspect

who was possibly armed and not willing to cooperate with law enforcement instructions.  The arrival

of a back-up officer on the scene provided the manpower necessary to remove the Defendant from

the Buick.  Upon removal, the officers placed the Defendant in a cruiser while they ran a records

check that by all accounts lasted a matter of minutes.  When the records check was completed and

reported to the officers, the Defendant was arrested.

Because the Defendant did not comply with commands to exit the vehicle, and because the

officers believed that he was armed when they removed him from the Buick, detention of the

Defendant in the back of the cruiser while a records check was completed was a reasonable course

of action.  See Caruthers, 458 F.3d at 468-69 (finding that placing a suspect, who attempted to flee,

in the back of a police cruiser was reasonable where officers who responded to a gunfire call

observed the suspect in a position which indicated he was discarding a firearm).  The Defendant was

held for only a matter of minutes before the records check was completed and he was placed under

arrest. Based upon the foregoing, the Court concludes that the detention following the initial stop was sufficiently limited in time and employed the least intrusive means of investigation that were reasonably available. Therefore, the Court finds that the detention was appropriate under <u>Terry</u> and was not an unlawful detention.

## B. Probable Cause to Arrest

The Defendant also disputes the probable cause supporting his arrest. The Defendant argues that there was no proof that the firearm which was found in the back of the Buick was his. Therefore, he alleges that the officers lacked probable cause to arrest him. The Government maintains that there was probable cause to arrest the Defendant.

"[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983). "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." <u>Maryland v. Pringle</u>, 540 U.S. 366, 371 (2003). However, the common substance of all the definitions of probable cause is "a reasonable ground for belief of guilt" that is particularized with respect to the person to be searched or seized. <u>Id</u>.

In the present case, Officer Pickens had circumstantial evidence that the automobile on which he found the Defendant had been tied to an earlier firearm disturbances. Once Officer Pickens arrived on the scene, he observed an object that appeared to be a handgun in the Defendant's waistband. Further, Officer Pickens noted that the Defendant was both nervous and evasive and that his mannerisms, including the clinching of his waistband, were consistent with carrying a firearm. The Defendant reacted to Officer Pickens's arrival by ducking into another vehicle in what the

17

officer perceived to be an attempt at evasion. Thereafter, the Defendant did not comply with Officer Pickens's commands to exit the car. The Defendant was removed from the backseat where he had been sitting on a specific towel, and during the search that followed, a handgun was found below the same towel.

Based on the totality of the circumstances as reviewed above and more fully analyzed in the Court's discussion of reasonable suspicion, the Court finds that upon detention there was probable cause to believe that the Defendant was guilty of carrying a firearm in violation of state law, and once the records check revealed that the Defendant was a felon, there was probable cause to arrest the Defendant for being a felon in possession in violation of 18 U.S.C. § 922(g)(1). Accordingly, the Court finds that Officer Pickens and Officer Schreiber had probable cause to believe that the Defendant committed a crime, and thus, had grounds for effectuating an arrest.

## C. Search Incident to Arrest

Based upon his allegation that there was no probable cause for arrest, the Defendant argues that the crack cocaine found on his person after his detention was the fruit of an unlawful search. The Government responds that a lawful search incident to arrest rendered the crack cocaine, and it is fully admissible.

Searches incident to arrest are a well established exception to the warrant requirement of the Fourth Amendment of the United States Constitution. United States v. Robinson, 414 U.S. 218, 236 (1973). "When officers have probable cause to believe that a person has committed a crime in their presence, the Fourth Amendment permits them to make an arrest, and to search the suspect in order to safeguard evidence and ensure their own safety." Virginia v. Moore, 553 U.S. ____ , 128 S. Ct. 1598, 1608 (2008).

At the hearing, Officer Pickens testified that the Defendant was searched by the driver of the wagon which would transport the Defendant to a detention facility. During this search, crack cocaine was found in the Defendant's pocket. Because the Court has found that there was probable cause to arrest the Defendant, the search incident to arrest was lawful, and the Court finds that the crack cocaine found during the search should not be suppressed.

### D. Standing to Object to the Search of the Buick

Finally, the only indication that the Defendant objects to the search of the Buick is the portion of his memorandum that states, "Once he was seized, the officers searched the Buick. They claim they did it with permission of the owner." [Doc. 13 at 2]. In its response [Doc. 15] and at the hearing, the Government stated that, to the extent the Defendant objected to the search of the Buick, he had no standing to object because he had no expectation of privacy in the automobile and because the handgun was abandoned property. At the hearing, the Defendant argued that he had standing to challenge the search of the Buick as a passenger and because the gun was not abandoned property. However, the Defendant did not attempt to present any argument at the hearing that would undermine or dispute the owner of the Buick's consent to search. The Court will briefly address the Defendant's argument that he has standing to object to a search of the Buick, despite the fact that the Defendant has not advanced a substantive argument specifically objecting to the search.

The Court of Appeals for the Sixth Circuit has recognized that "[b]ecause Fourth Amendment rights are 'personal,' the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized." United States v. Waller, 426 F.3d 838, 843 (quoting Rakas v. Illinois, 439 U.S. 128, 140 (1978)). While the Court is aware that in Brendlin v. California, 551

19

U.S. ___, 127 S. Ct. 2400 (2007), the United States Supreme Court recently recognized that a passenger riding in an automobile that has been pulled over has been seized and has standing to challenge the stop, the facts of the present case are distinguishable from those in <u>Brendlin</u>.

The Court in <u>Brendlin</u> addressed a passenger's standing to object to detention where an automobile was pulled over. <u>Id</u>. at 2410. The Court concluded that the passenger was seized for Fourth Amendment purposes and, just like the driver, had standing to object to the seizure. <u>Id</u>. The present case implicates a completely different factual situation, because the Defendant was not really a passenger in the Buick. Instead, he apparently was using the Buick as a place to sit and avoid the police. Further, the Defendant's legal argument is distinguishable in that the Defendant seeks to object to the search of a vehicle and not a stop and detention of a vehicle and its passengers. The Court finds that the standing acknowledged in <u>Brendlin</u> is not applicable to the present case, and the Defendant has not directed the Court, nor has the Court found, any authority that would support the Defendant's contention that he has standing to object to the search of the Buick.

Based on the foregoing, the Court finds that the Defendant's objections to the search of the Buick, to the extent they exist, are baseless because the Defendant lacks standing to object to the search of an automobile, owned by another person, which he momentarily sat in while avoiding police detention. Under the facts of the present case, the Defendant had no grounds for an expectation of privacy within the Buick. Because the Defendant had no expectation of privacy in the Buick, he also has no standing to object to the search thereof. <u>See</u> <u>Waller</u>, 426 F.3d at 843.

20

## III. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing and after reviewing the relevant legal authorities, the Court finds that: Officer Pickens had reasonable suspicion to stop the Defendant for investigation; the stop employed the least intrusive investigative means reasonably available; Officer Pickens and Officer Schreiber had probable cause to arrest the Defendant; the Defendant was lawfully searched as an incident to his arrest; and the Defendant has no standing to object to the search of the Buick from which he was removed. Therefore, it is **RECOMMENDED** that the Defendant's Motion to Suppress **[Doc. 12]** be **DENIED**.[1]

Respectfully Submitted,

_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[1]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).