IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:08-CR-129 |
| ) | (PHILLIPS/GUYTON) |
| ADAM HOLMES, ) | |
| ) | |
| Defendant. ) | |

### REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court, as may be appropriate. The Defendant is charged in a three count Indictment [Doc. 1], with (1) being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1); (2) possession with intent to distribute crack cocaine within 1,000 feet of the real property of a public elementary school in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 860; and (3) knowingly using and carrying a firearm during and in relation to a drug trafficking crime in violation of 21 U.S.C. § 841(a)(1).

### I. PROCEDURAL POSTURE

The Defendant filed a Motion to Suppress [Doc. 12], which the Government opposed [Doc. 15]. The parties appeared before the Court for a motion hearing on November 25, 2008, to address the Defendant's motion. Assistant United States Attorney David Lewen represented the Government. Attorney Kim Tollison represented the Defendant. The Court heard the evidence presented and the arguments of the parties on the motion. The Court took the motion under

advisement on November 26, 2008.

On December 22, 2008, this Court submitted its Report and Recommendation [Doc. 22] to the District Court. The same day Attorney Douglas Trant was substituted as counsel for the Defendant, replacing Attorney Tollison. On January 16, 2009, the District Court accepted the Report and Recommendation in its entirety [Doc. 24]. After the District Court's acceptance of the Report and Recommendation, the Defendant filed a Motion to Late File Objection to Report and Recommendation and Motions [Doc. 25], which was granted. The District Court considered both the Defendant's late filed Motion to Supplement the Record [Doc. 28] and Objection to Report and Recommendation [Doc. 26] and denied both. Thereafter, the Defendant filed a Motion to Reopen the Suppression Hearing [Doc. 33], which this Court granted [Doc. 35].

The parties appeared before the Court on March 10, 2009, to reopen the previous hearing and allow for introduction of supplemental evidence. Assistant United States Attorney David Lewen was present representing the Government. Attorney Douglas Trant was present representing the Defendant, who was also present. The Court heard the evidence presented and the arguments of the parties on the motion. The Court again took the Motion to Suppress [Doc. 12] under advisement on March 11, 2009.

## II. FACTS

In its prior Report and Recommendation [Doc. 22], this Court set out factual findings based on the totality of the testimony given at the evidentiary hearing on November 25, 2008. Those factual findings are hereby incorporated herein by reference.

At the second hearing, the Defendant only took issue with the Court's previous findings that there was reasonable suspicion to support a Terry stop and that there was probable cause to support

2

Case 3:08-cr-00129-TAV-HBG   Document 39   Filed 03/24/09   Page 2 of 14   PageID #: 141

arresting the Defendant. To address these two issues, the Court re-states the following, pertinent facts from its prior Report and Recommendation:

> [Officer John Pickens ("Officer Pickens") of the Knoxville Police Department (KPD)] testified that he was on duty on August 2, 2008, the night on which the Defendant is alleged to have committed the above described crimes. Officer Pickens stated that he was conducting surveillance of the Brothers night club on Martin Luther King Boulevard. Officer Pickens explained that he was stationed on top of the Atlas Electric Supply Company across the street from the club, which was a known high crime area. Officer Pickens estimated that between 1:30 and 2:00 a.m. that morning, he heard the sound of gunshots coming from the intersection of Martin Luther King Boulevard and Chestnut Street. Officer Pickens stated that, when he looked in the vicinity that the gunshots were coming from, he saw a white box-shaped Chevrolet Caprice with large rims on it. The Government presented Officer Pickens with a photograph of an automobile, which Officer Pickens identified as a picture of the white box-shaped Chevrolet Caprice he had seen at the intersection of Martin Luther King Boulevard and Chestnut Street. . . .
> Officer Pickens testified that when he saw the Caprice its engine was engaged and it was facing northbound on Chestnut Street. Officer Pickens confirmed that if the Caprice proceeded in the direction that it was facing, it would have gone to the 2400 block of Martin Luther King Boulevard. Officer Pickens stated that he could see the Caprice had a black male driver and that he later determined that the car was registered to the Defendant. Officer Pickens explained that he did not continue observing the car but, instead, began scanning the crowd to make sure that there were no victims of the gunshots lying on the ground.
> Officer Pickens confirmed that he saw the same Chevrolet Caprice later that morning at the Weigel's, a market and gas station, located at 411 E. Summit Hill Avenue. Officer Pickens stated that around 4:00 a.m. radio transmissions advised officers to look for a white box-shaped Chevrolet Caprice, with large chrome rims, being driven by a black male, because the Caprice was observed in a disturbance call in the 2400 block of Martin Luther King Boulevard. According to the "Be on the Lookout" (BOLO) advisory, there had been a verbal fight and/or argument, over gang-related incidents, and it was alleged that a firearm was involved. Officer Pickens explained that upon hearing the BOLO advisory, he thought that the vehicle was the same one he had seen earlier in the night. Officer Pickens noted that eyewitnesses at the scene said the Caprice was heading

3

toward Weigel's on Summit Hill Ave, which was three to five minutes from the Martin Luther King-Chestnut intersection.

Officer Pickens explained that when he heard the BOLO he was at the KPD headquarters at 800 Howard Baker Jr. Boulevard, which is approximately three minutes from the Weigel's. Upon hearing the BOLO, Officer Pickens drove to the Weigel's. Officer Pickens stated that he is familiar with this particular Weigel's as a high-crime area with prostitution and drug activity and violent crime. Officer Pickens estimated that in the last two years he has responded to incidents at the location approximately two to three times per week.

Officer Pickens testified that prior to pulling into the Weigel's he saw the box-style Chevrolet Caprice with large rims, which he was a hundred percent positive was the same car he had seen earlier. Officer Perkins explained that, despite it being approximately 4:00 a.m. and dark out, he could see the Caprice because it was parked directly underneath a street light. The Government presented Officer Pickens with a photograph, which he identified as a photograph of the east side of the Weigel's, with the Caprice in the position it was in when he arrived—parked directly underneath a street light. . . .

Officer Pickens explained that as he pulled into the Weigel's he could see a black male sitting on the trunk of the Caprice. Officer Pickens stated that at the time he pulled into the Weigel's people were screaming "Five-O," a warning that police are arriving. Officer Pickens said that in response to this warning, people began scattering and the Defendant, the black male seated on the trunk of the Caprice, looked in his direction, made eye-contact with Officer Pickens, and hopped off the trunk. Officer Pickens observed the Defendant proceed around the front of a Buick LeSabre, which was parked next to the Caprice, and walk back toward the Buick's rear passenger door. Officer Pickens explained that another, larger black male was at the rear passenger door and the Defendant appeared to try to hide the front of his body behind the other male. Officer Pickens confirmed that he had received training in weapons concealment and knew to look for body language, nervous actions, and certain movements as indicators of a suspect being armed. Further, Officer Pickens stated that he knew firearms were most often hidden in a suspect's waistband and the small of the back. At the hearing, Officer Pickens demonstrated the motions he observed the Defendant make. He explained that based upon his training and experience the Defendant was attempting to conceal a firearm. He stated that he could see what "appeared to be the butt end of a pistol in his waistband." [Tr. 15].

. . .

4

> [On cross-examination,] Officer Pickens said that he saw the black pistol when the Defendant rounded the front of the Buick and was facing him. Officer Pickens noted that he was standing at the driver's side front quarter of his vehicle about twenty five or thirty feet from the Defendant. Officer Pickens agreed that rounding the front of the Buick, the light would have been at the Defendant's back, but Officer Pickens said he could tell the item was a black handgun.

[Doc. 22 at 2-8].

At the second hearing, Officer Pickens was the only witness, and the following factual information was presented to the Court. Attorney Trant examined Officer Pickens first,[1] and Officer Pickens confirmed that he remembered his testimony about the Defendant having a gun in his belt on the night in question. Attorney Trant presented Officer Pickens with a copy of a short memorandum[2] he sent to his supervisors describing the incident. Officer Pickens confirmed that he had composed the memo, and it was admitted into evidence as **Exhibit 1** without objection. Officer Pickens reviewed the memo and confirmed that it says, "Mr. Holmes was holding something in the front of the waistband of his pants and was trying to elude me from stopping him." Officer Pickens stated that the "something" in the waistband appeared to be the grip-end of a firearm but agreed that he did not mention that detail in this memo. Officer Pickens also confirmed that the description of the facts in the memo was given closer to the time of the events in question than his testimony at the previous hearing.

---

[1] The parties agreed that the Defendant would present his supplemental evidence first and the Government would respond.

[2] At the hearing, Attorney Trant referred to this document as an email, but it does not have a time stamp, email addresses, or IP addresses, and thus, appears to be a memorandum summarizing the events.

5

Attorney Trant then presented Officer Pickens with an affidavit of complaint which was given to secure a warrant following the encounter between Officer Pickens and the Defendant at the Weigel's. Officer Pickens confirmed that he was the affiant officer for the affidavit, and the affidavit was admitted into evidence as **Exhibit 2** without objection. Officer Pickens agreed that the affidavit states, "The [Defendant] was holding something in his front waistband and ducked into the Buick," but does not specifically state that a gun was in the waistband.

Finally, Attorney Trant presented an in-cruiser video, which Officer Pickens confirmed was the video from his police cruiser. The video was admitted into evidence as **Exhibit 3** without objection. Officer Pickens explained that on the video a listener can hear Officer Pickens talking to another officer who just arrived on the scene. Officer Pickens confirmed that later in the video he mentions a gun, but it is not mentioned in the series of statements that the Defendant drew the Court's attention to.

Thereafter, the Government questioned Officer Pickens. Looking at 4:12:53 a.m. on the video, Officer Pickens agreed that he can be heard saying, "He's had enough time to stuff it in that damn seat." Officer Pickens explained that "he" referred to the Defendant, "seat" referred to the backseat of the Buick, and "it" referred to a firearm. Officer Pickens confirmed that at 4:13:15 a.m. he explains to the Buick's driver, "He hopped in your car and probably just hid a firearm back there." Officer Pickens stated that at 4:15:10-13 a.m. he can be heard explaining to the other officer, "Yeah he had it right here in his waistband." Officer Pickens testified that "it" referred to a firearm. Officer Pickens explained that at 4:15:23-27 he can be heard stating that the Defendant "pulled it out of his waistband and pitched it right there."

6

When re-examined by Attorney Trant, Officer Pickens confirmed that some of the statements about finding a firearm are after the Defendant had been ordered to get out of the Buick.

The Government argues that the evidence, which the Defendant presented as impeachment evidence, does not actually impeach Officer Pickens's testimony. Instead, the Government maintains that the additional evidence reinforces Officer Pickens's previous testimony. The Government reminded the Court that Officer Pickens was going to Weigel's to look for a specific car. He was not just coming on shift, but rather had a great deal of contextual information that was corroborated by the Defendant's behavior.

The Defendant argues that the evidence presented at the second hearing impeaches Officer Pickens because Officer Pickens did not initially identify the object in the waistband as a firearm. The Defendant maintains that Officer Pickens only found that the object was a firearm after the Defendant was detained and that there was not reasonable suspicion for a <u>Terry</u> search or probable cause to arrest at the time of the search.

### III. ANALYSIS

This Court analyzed all the Defendant's grounds for suppressing evidence in this case in its previous Report and Recommendation [Doc. 22]. The Court hereby incorporates all of its legal findings from the previous Report and Recommendation into this Report and Recommendation—including those addressing the investigative stop and detention, probable cause to arrest, search incident to arrest, and the Defendant's standing to object to the search [Doc. 22 at 9-22]. However, because the additional evidence presented at the March 10, 2009, hearing relates only to the reasonable suspicion supporting the Defendant's stop and the probable cause supporting his subsequent arrest, in this Report and Recommendation the Court will address only those issues

and explain why its analysis and findings on each continue to favor denial of the motion to suppress.

### A. *Reasonable Suspicion for an Investigative Stop*

As the Court explained in its previous Report and Recommendation:

> The Court of Appeals for the Sixth Circuit recommends a two-part test to determine the legitimacy of an investigatory stop. See e.g., United States v. Luqman, 522 F.3d 613, 616-17 (6th Cir. 2008); United States v. Davis, 430 F.3d 345 (6th Cir. 2005). First, a court must determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." Davis, 430 F.3d at 354 (quoting United States v. Garza, 10 F.3d 1241, 1245 (6th Cir.1993)). If the basis for the Terry stop was proper, then the Court must determine "whether the degree of intrusion ... was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." Davis, 430 F.3d at 354 (quoting Garza, 10 F.3d at 1245).
>
> The "totality of the circumstances" in the present case consists of the following pieces of information: Officer Pickens's observation of an automobile fitting the unique description of a white box-style Chevrolet Caprice with large rims at the scene of gunfire; a known witness's statement that a suspect was leaving the scene of a shooting in a car fitting the same unique description and was headed toward the Weigel's; Officer Pickens's knowledge that the scene of the shooting was just moments from the Weigel's; the Defendant sitting on the hood of the automobile fitting the unique description only moments after the shooting; the lateness of the hour; the high-crime volume at the Weigel's; the Defendant's evasive behavior; the Defendant's movements and posture, which were consistent with carrying a weapon; and finally, Officer Pickens's observation of what appeared to be the butt of a firearm in the Defendant's waistband.
>
> Looking first at the unique description of the automobile and its proximity to the scene of two different criminal acts on the night in question, the Court concludes that this information weighs in favor of reasonable suspicion. The Court of Appeals for the Sixth Circuit has previously held that such information constitutes specific and articulable facts which give rise to reasonable suspicion. For example, in United States v. Hurst, 228 F.3d 751(6th Cir. 2000), a "car roughly matching the appearance of a suspects in color and

8

style" was reportedly seen outside a residence at the time of a burglary. Id. at 757. Minutes later, an off-duty officer observed a vehicle matching the previously reported description traveling away from the vicinity of the residence at a high speed and reported to other deputies that the automobile's front grill was missing. Id. Another deputy spotted and pulled over a vehicle traveling in the reported direction with the distinctive description, and at a time consistent with the time needed to travel to that point from the residence. Id. The Court of Appeals held that based upon the final deputy's knowledge of the time and area coupled with the other reported information, including the description and direction of travel, the deputy had reasonable suspicion to stop the vehicle. Id.

In the present case, the description of the automobile was equally unique—a white automobile which is over twenty years old with large rims— and, as in Hurst, supports reasonable suspicion of the vehicle. A known eye-witness had informed officers that an automobile fitting the description was linked to an earlier altercation involving gunfire and was headed to the Weigel's. Further, the vehicle's presence upon Officer Pickens's arrival was consistent with the short amount of time required to travel between the crime scene and the Weigel's. Finally, Officer Pickens's earlier observation of the automobile, even if not conclusive proof of criminal activity, gives additional circumstantial support for reasonable suspicion of the Defendant. See United States v. Blum, 614 F.2d 537 (6th Cir. 1980) (finding reasonable suspicion supporting an investigative stop where officers initially spotted a truck near a train yard where burglaries had been reported and later the same night spotted the same truck again parked near the train yard).

While the above factors and circumstances support reasonable suspicion of the automobile, the Court continues its analysis for reasonable suspicion tied directly to the Defendant out of an abundance of caution. First and foremost is the Defendant's location at the time of Officer Pickens's arrival—on the hood of the suspect vehicle. In addition, the high-crime rate at the Weigel's, the late hour, observation of an object that appeared to be a handgun, and the Defendant's nervous and evasive behavior support Officer Pickens's suspicions of the Defendant.

While an individual's presence in an area of frequent criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime, Brown v. Texas, 443 U.S. 47, 52 (1979), "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation," United States v. Wardlow, 528 U.S. 119, 124

9

(2000). In the present case, Officer Pickens testified that he had worked the eastern police district in Knoxville and was familiar with the Weigel's, which in his recollection was involved in two to three criminal incidents per week. Although this factor cannot stand alone, the high-crime level at the Weigel's supported Officer Pickens's suspicion of the Defendant.

The late hour of the stop also contributes to reasonable suspicion. The Court of Appeals for the Sixth Circuit has previously cited 1:00 a.m. and 1:30 a.m. as times that are sufficiently late to arouse suspicion. United States v. Blair, 524 F.3d 740, 751 (6th Cir. 2008). In the present case, the Defendant was observed on the suspect vehicle at approximately 4:00 a.m. Again this information supports a finding of reasonable suspicion but does not stand alone.

Nervous, evasive behavior is also pertinent to determining reasonable suspicion, Brignoni-Ponce, 422 U.S. at 885, but "nervousness is generally included as one of several grounds for finding reasonable suspicion and not a ground sufficient in and of itself." United States v. Mesa, 62 F.3d 159, 162 (6th. Cir. 1995). In the present case, the Defendant's nervousness was combined with a posture and mannerisms consistent with carrying a concealed weapon, which is more suspicious than mere nervous fidgeting. The Defendant correctly points out that other persons in the area scattered when Officer Pickens's cruiser pulled into the parking lot, but the Defendant's actions are distinguished from those of other bystanders by his eye-contact with the officer followed by immediate diversion of his eyes, his posture and mannerisms which indicated that he was carrying a firearm, and his use of another larger man to conceal him from the officer's sight while he entered another vehicle. The Defendant's nervous and evasive behavior is distinguishable from the behavior of others in the crowd and contributes to reasonable suspicion for stopping the Defendant.

Finally, and most importantly, Officer Pickens saw what appeared to him to be the butt of a firearm in the Defendant's waistband just before the Defendant entered the Buick. It is well-established that in "evaluating whether the totality of the circumstances supports the conclusion that reasonable suspicion exists, courts must allow officers to draw upon their experience and training to make inferences." United States v. Torres-Ramos, 536 F.3d 542, 552 (6th Cir. 2008) (citing Arvizu, 534 U.S. at 273). Officer Pickens has received training in weapon concealment and in his two years with the police department certainly became familiar with handguns. Drawing on his experience and training, he believed the object he saw protruding from the Defendant's waistband was a handgun.

10

The Defendant argues that Officer Pickens was not able to see the handgun, given the time of night and his perspective. The Court, however, finds Officer Pickens's testimony to be credible and notes that these events took place directly under a street lamp which illuminated the area. Accordingly, the Court finds that Officer Pickens's observation of an object that appeared to be a handgun in the Defendant's waistband also supported the investigative stop.

Officer Pickens's previous observation of the automobile, with the other reported events and eyewitness statements, the late-hour, the high-crime rate of the Weigel's, his observation of what appeared to be a handgun, the Defendant's nervous behavior, and the Defendant's posture and mannerisms, combine to provide reasonable suspicion to stop the Defendant. Officer Pickens testified that he was aware of all of the above listed pieces of information. These pieces of information are specific and articulable facts which gave rise to reasonable suspicion that criminal activity was afoot, and therefore, the totality of the circumstances supports a finding that the stop was reasonable and lawful under the first prong of Terry.

The Court finds that the additional evidence does not impeach the prior testimony of Officer Pickens, relied on by the Court in its above analysis. Officer Pickens certainly could have been more specific on the matter of the firearm in the affidavit (Exhibit 2) and the memorandum (Exhibit 1). However, the lack of specificity does not undermine his prior testimony that he observed the grip-end of a firearm as Defendant moved from the hood of the Caprice into the back of the Buick.

Further, the Court finds that the video evidence supports Officer Pickens's original testimony that he observed a firearm in the Defendant's waistband. While the Defendant argues that the discussions on the video about a firearm start only after the firearm has been found, the Court finds that on the video Officer Pickens makes statements about the Defendant having a firearm before the firearm is recovered, which reinforce his testimony. Specifically, Officer Pickens can be heard saying, as he approaches the Buick, "He's had enough time to stuff it in that damn seat," and before entering the Buick, where the firearm was ultimately recovered, Officer Pickens explains to the

11

Buick's driver, "He hopped in your car and probably just hid a firearm back there."

As the Court noted when explaining the weight accorded to Officer Pickens's observation in the previous Report and Recommendation, Officer Pickens has training and experience in spotting firearms that suspects attempt to conceal, and the additional evidence in the record further supports Officer Pickens's previous testimony that he saw the butt-end of a firearm as the Defendant moved from the hood of the Caprice to the back of the Buick. Accordingly, the Court finds it appropriate to rely on the analysis contained in the previous Report and Recommendation.

Thus, the Court finds Officer Pickens's previous observation of the automobile, with the other reported events and eyewitness statements, the late-hour, the high-crime rate of the Weigel's, the officer's observation of what appeared to be a handgun, the Defendant's nervous behavior, and the Defendant's posture and mannerisms, combine to provide reasonable suspicion to stop the Defendant. As previously stated, these pieces of information are specific and articulable facts which gave rise to reasonable suspicion that criminal activity was afoot, and therefore, the totality of the circumstances supports a finding that the stop was reasonable and lawful under the first prong of Terry.

### B. *Probable Cause to Arrest*

For the reasons more fully explained above, the Court finds that Officer Pickens's testimony remains credible and continues to form a factor in the Court's analysis of whether the officers had probable cause to arrest the Defendant. Accordingly, the Court adopts and reiterates its previous analysis of the Defendant's argument that probable cause was lacking, which is as follows:

> "[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). "The probable-cause standard is incapable of

12

precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." Maryland v. Pringle, 540 U.S. 366, 371 (2003). However, the common substance of all the definitions of probable cause is "a reasonable ground for belief of guilt" that is particularized with respect to the person to be searched or seized. Id.

In the present case, Officer Pickens had circumstantial evidence that the automobile on which he found the Defendant had been tied to an earlier firearm disturbances. Once Officer Pickens arrived on the scene, he observed an object that appeared to be a handgun in the Defendant's waistband. Further, Officer Pickens noted that the Defendant was both nervous and evasive and that his mannerisms, including the clinching of his waistband, were consistent with carrying a firearm. The Defendant reacted to Officer Pickens's arrival by ducking into another vehicle in what the officer perceived to be an attempt at evasion. Thereafter, the Defendant did not comply with Officer Pickens's commands to exit the car. The Defendant was removed from the backseat where he had been sitting on a specific towel, and during the search that followed, a handgun was found below the same towel.

Based on the totality of the circumstances as reviewed above and more fully analyzed in the Court's discussion of reasonable suspicion, the Court finds that upon detention there was probable cause to believe that the Defendant was guilty of carrying a firearm in violation of state law, and once the records check revealed that the Defendant was a felon, there was probable cause to arrest the Defendant for being a felon in possession in violation of 18 U.S.C. § 922(g)(1). Accordingly, the Court finds that Officer Pickens and Officer Schreiber had probable cause to believe that the Defendant committed a crime, and thus, had grounds for effectuating an arrest.

### IV. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearings held November 25, 2008, and March 10, 2009, and after reviewing the relevant legal authorities, the Court finds that Officer Pickens's testimony at both hearings was credible and, thus, continues to serve a factor in the Court's finding that reasonable suspicion to conduct a Terry stop existed at the time Officer Pickens approached the Defendant and that the officers had probable cause to arrest the Defendant.

13

In summation of both Report and Recommendations, the Court continues to find that: Officer Pickens had reasonable suspicion to stop the Defendant for investigation; the stop employed the least intrusive investigative means reasonably available; Officer Pickens and Officer Schreiber had probable cause to arrest the Defendant; the Defendant was lawfully searched as an incident to his arrest; and the Defendant has no standing to object to the search of the Buick from which he was removed. Therefore, it is hereby **RECOMMENDED** that the Defendant's Motion to Suppress **[Doc. 12]** be **DENIED**.[3]

Respectfully Submitted,

    s/ H. Bruce Guyton
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).